## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Keith Brown, being sworn, state:

### Introduction and Agent Background

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  Since joining the FBI in 2014, I have been assigned to squads that investigate economic crimes, including various forms of corporate and securities fraud.  During my training at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.      I submit this affidavit in support of a criminal complaint charging SHANE KENNETH SCHMIDT with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5.

3.      Because this affidavit is being submitted for the limited purpose of demonstrating that there is probable cause to arrest SCHMIDT on the federal criminal charges set forth above, I have not included each and every fact known to me and to other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested warrant.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

### General Background and Definitions

4.      Shares, or "securities," of publicly traded companies (known as "issuers") that are acquired directly from the issuers, and are not registered with the U.S. Securities and Exchange

Commission ("SEC"), generally cannot be sold to the public.  Such shares are considered "restricted," and bear a legend indicating that fact on their face.  Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "unrestricted" or "free-trading," and may be bought and sold in the public market by non-affiliates.

5.      "Penny" or "microcap" stocks are securities issued by small, publicly traded companies that typically trade at less than $5 per share, and often less than $1 per share.  Penny stocks typically are not listed on organized securities exchanges such as the New York Stock Exchange or the NASDAQ Stock Market, but rather are traded on the over-the-counter ("OTC") market (further described below).  Such stocks are particularly susceptible to manipulative trading and other forms of fraud because, among other things, they are often thinly traded and their free-trading shares may be controlled by a single individual or group of individuals (often called a "control group") through third-party or "nominee" shareholders.

6.      OTC Markets is a stock quotation service that facilities trading for public companies whose stock is not otherwise listed on national securities exchanges.  Public companies that do not have an obligation to file reports with the SEC may, nonetheless, choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.  The lowest tier of the platforms that OTC Markets provides is the Pink Open Market.  Depending on the amount of information a company publishes, OTC Markets rates companies on the Pink Open Market as either Current Information, Limited Information, or No Information.

7.      Rule 144 of the rules and regulations promulgated by the SEC ("Rule 144") sets forth, among other things, conditions that permit the sale of restricted securities by individuals or

entities who are deemed "affiliates" of issuers.  An "affiliate" is, among other things, a person or entity who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer.  Typically, affiliates include officers, directors, and controlling shareholders, and entities or persons holding more than 10 percent of an issuer's stock are generally deemed to be affiliates.  In the context of OTC securities, affiliates are not permitted to sell more than one percent of an issuer's total outstanding shares in any three-month period.

8.      A "pump-and-dump" scheme typically involves an effort to artificially inflate the stock price or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's stock can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump"). Typically, such schemes involve the use, among other means, of news releases and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and generate demand for the shares.  Often such schemes employ "boiler rooms," wherein multiple individuals work in a coordinated effort to contact potential investors, often through unsolicited "cold calls," and provide false, misleading, unfounded, and/or exaggerated information about the company in order to induce the potential investors to purchase shares.

### "Sandy Steele" Securities Fraud Scheme

9.      SHANE KENNETH SCHMIDT is a 52 year-old Canadian citizen and resident of Vancouver, British Columbia.  Based on the facts set forth below, I have probable cause to believe that SCHMIDT participated in a pump-and-dump scheme involving shares of a Minnesota penny stock company, Sandy Steele Unlimited, Inc. ("SSTU"), in order to share in the proceeds from the sale of SSTU shares to unsuspecting investors at inflated prices.  As part of

the scheme, SCHMIDT purported to be "John Scott," a fictitious individual whom SCHMIDT represented to be the sole officer and director of SSTU.  SCHMIDT also provided fraudulent information to OTC Markets and others while pretending to be "John Scott," thereby enabling SSTU's stock to trade via the OTC Markets platform.  And SCHMIDT established a website for SSTU containing false and misleading statements about its purported business—at or about the same time that a boiler room campaign promoted the stock—thereby generating interest in the stock and artificially boosting demand for its shares.

### *SSTU: From Reinstatement to Trading*

10.     SSTU is a Minnesota corporation that was incorporated in or about 1968 under a different name.  The company was administratively dissolved in or about January 2006 for failing to file an annual renewal.  SSTU's stock traded very sporadically in the years that followed, with no shares publicly traded on approximately 93% of trading days during the years 2008 through 2018.

11.     Twelve years later, on or about December 20, 2018, an individual identifying himself as "John Scott" submitted change-of-control documents to OTC Markets from the email address johnscott@sstu.biz.  The materials indicated that SSTU had undergone a change of control in or about October 2017, when then-President and sole Director Sandy Steele resigned and was replaced by "John Scott."  "John Scott" also submitted an order form to OTC Markets indicating that the company's new management intended to revive trading in the company's stock via the OTC Markets platform in or about 2019.

12.     That same month, "John Scott" filed reinstatement/renewal materials with the Minnesota Secretary of State and purchased the website domain name "sstu.biz" along with 12 months of basic web hosting from "Bluehost," a web hosting service.

13.     In fact, I have probable cause to believe that the change-of-control documents—
which were purportedly notarized in Vancouver—were fake, and SSTU's takeover by "John
Scott" was not authorized.  In an interview with me, Sandy Steele stated, in sum and substance,
that she did not sign, nor was she even aware of, the documents purporting to reflect (i) her
resignation and (ii) the appointment of "John Scott" to replace her in October 2017.

14.     On or about March 20, 2019, SSTU published financial statements with OTC
Markets for the years 2016, 2017, and 2018, along with an annual report for the year 2018.  All
the filings were (and remain) publicly available on the OTC Markets website, including to
prospective investors in Massachusetts.  The filings stated that the company was an "emerging
direct marketer of anti-aging health and beauty products," but had no sales or revenue in any of
the years 2015 through 2018.  The disclosure statement identified "John Scott" as the President,
Secretary, and sole Officer and Director of the company, and provided contact information for
him, including an address in Tucson, AZ, a phone number with a 310 area code (associated with
Los Angeles, CA), and the email address johnscott@sstu.biz.

15.     On or about April 1, 2019, SSTU filed with OTC Markets an opinion letter from
an attorney in Las Vegas.  The opinion letter, which was publicly available on the OTC Markets
website, provided the attorney's opinion that, in sum and substance, SSTU had met the reporting
and other requirements necessary for its stock to be traded via the OTC Markets platform.  On or
about April 3, 2019, OTC Markets upgraded SSTU's information classification to "Current."

16.     In June 2019, "John Scott" entered into four simultaneous settlement agreements
on behalf of SSTU with entities claiming to be debtholders in the company.  Each of the four
debtholders had purportedly acquired $3,000 in debt in January 2019 from a single debtholder,
which had purportedly held $12,000 in SSTU debt.  The $12,000 debt instrument was

purportedly signed by Sandy Steele (the individual) in 2016, but Steele told me she did not sign it, nor was she aware of it.  In addition, for reasons discussed below, I have probable cause to believe that $12,000 was never provided to SSTU to fund the purported debt.  "John Scott" nevertheless agreed to issue each of the four debtholders 3 million shares in SSTU in exchange for cancelling the fake debt.  ("John Scott" had similarly signed each of the debt assignments in January 2019.  Just as with the change-in-control documents, the $12,000 fake debt instrument was purportedly notarized in Vancouver.)

17.     One of the debtholders to whom the shares were to be issued was a British Columbia corporation (hereinafter "Corporate Shareholder 1"), the director and owner of which is a Vancouver resident (hereinafter "Individual 1").  Individual 1 opened Corporate Shareholder 1's bank account as the company's signing officer and described Corporate Shareholder 1 as a "venture capitalist for private tech companies to go public."  A second Vancouver resident (hereinafter "Individual 2") was granted authority as a signor on the bank account in or about October 2018.

18.     SSTU used a corporate transfer agent to issue and cancel the company's stock. To obtain their new share issuances in unrestricted—i.e., free-trading—form, Corporate Shareholder 1 and the three other entities simultaneously obtained opinion letters from an attorney.  The opinion letters provided, in sum and substance, that the entities qualified to receive unrestricted shares under Rule 144 because they were not "affiliates" of SSTU.  Before issuing the opinion letters, the attorney requested and received a copy of the purported bank draft funding the fake $12,000 debt instrument issued in 2016.

19.     In fact, I have probable cause to believe that the opinion letters were false and that the four entities' concerted group ownership of over 10% of the company's stock—facilitated by

6

"John Scott"—made them affiliates of SSTU.  Among other things, all four entities converted their shares at the same time, based on the same phony debt instrument, and the same attorney issued all four opinion letters on the same day and was paid for all four in one transaction by a credit card in Individual 2's name.  In addition, the bank that purportedly issued the $12,000 bank draft to fund the fake debt instrument has no record of the draft (which, if the draft were legitimate, the bank ordinarily would).  In other words, just like the debt instrument itself, the bank draft supporting the instrument was fake.

20.     Corporate Shareholder 1 was issued its 3 million unrestricted shares on or about July 24, 2019.  On that date, SSTU had approximately 40,745,588 shares outstanding, which meant that Corporate Shareholder 1 (alone) held approximately 7.4% of SSTU's outstanding shares.  During this time period, SSTU was submitting reports to OTC Markets in accordance with the OTC Pink Basic Disclosure Guidelines.  Under those guidelines, SSTU was to disclose certain identifying and other information about any shareholder holding greater than 5% of the company's outstanding shares (a category in which Corporate Shareholder 1 then fell).  That information included whether any of the 5% shareholders, within the preceding 10 years, had been the subject of an order or judgment enjoining or barring the shareholder's involvement in any type of securities activities.  Individual 1—the sole director and owner of Corporate Shareholder 1—had previously been sued by the SEC for certain securities law violations and, in 2018, consented to the entry of a final judgment in federal court in Maryland that included a permanent penny stock bar.  The bar prohibited Individual 1 from "participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock."

21.     Approximately two days later, on or about July 26 2019, SSTU issued "John Scott" 40 million restricted shares for purported "services rendered."  The large issuance had the effect of diluting Corporate Shareholder 1's percentage holdings to below 5% of SSTU's outstanding shares, obviating the need to publicly report Corporate Shareholder 1's ownership (or that of the three other entities who were to receive, and did receive, 3 million shares each).  In reality, however, Corporate Shareholder 1, together with the other three entities, collectively owned 81% of the freely tradable securities of SSTU and approximately 13% of SSTU's total outstanding shares.

22.     SSTU reported a change in business direction in its filing with OTC Markets for the quarter ending September 30, 2019.  In its filings earlier that year, SSTU continued to describe itself as marketer of anti-aging health and beauty products.  But in its filing for the period ending September 30, SSTU reported that it was now in the "wearable tech" business. Specifically, it claimed to now sell cold-weather garments "[p]owered by rechargeable battery packs connected to integrated heating elements."  As set forth below, I have probable cause to believe that these statements were untrue and that SSTU was not, in fact, in the business of selling wearable tech.  SSTU nevertheless still continued to report zero revenues and no changes in its assets.

23.     In September 2019, SSTU registered the website domain "sandysteele.com" with Bluehost through "John Scott's" account.  The registration was paid for by the same credit card in Individual 2's name used to pay for the four opinion letters previously discussed.

24.     A publicly available website was subsequently created at sandysteele.com that marketed SSTU's purported products, as well as its stock's ticker symbol.  The website's headline was "Conquer the Cold with Sandy Tech" and emphasized the company's

"revolutionary heated garments."  The website described the company's supposed "next generation battery technology" and provided pictures of the company's purported products, which included "[h]eated puffer jacket & vests, water resistant heated jackets, heated thermal tops and pants, as well as heated insoles, socks and gloves."  Prominently displayed on every page of the website was the company's stock ticker and the platform on which the stock traded: "OTC: SSTU".

25.     In fact, the pictures on the website of products purportedly manufactured and sold by SSTU were phony.  The pictures were of products for sale by other manufacturers on other websites, and appear to have been taken from those websites, including Zappos.com, Amazon.com, and Alibaba.com.

26.     On October 11, 2019, subscriber johnscott@sstu.biz logged in to SSTU's account with OTC Markets and updated the company's online profile to provide the address for SSTU's new website (sandysteele.com).

27.     Beginning in or about mid-October 2019, shortly after the SSTU website launched, trading in the company's shares increased dramatically.  For the first nine and one-half months of 2019, the average closing price for SSTU's shares had been just over $0.05, and the average daily trading volume had been approximately 6200 shares.  Beginning October 18, 2019, however, trading volume increased dramatically, as did the stock's price.  The stock's price peaked at just over $0.61 on December 13, 2019, before beginning to slide back down to below $0.02 by the end of January 2020.  Average trading volume during this period was over 470,000 shares per day.

28.     Investors reported receiving unsolicited calls during this timeframe from individuals touting SSTU as a good investment.  For example, Investor 1, who is 87 years old

and resides in Middlesex County in Massachusetts, received such an unsolicited call and was told, in sum and substance, that SSTU had a contact that would facilitate a licensing deal with the NFL and that the stock would later trade on the NASDAQ national market. Investor 1 subsequently purchased approximately 25,000 shares in SSTU for just under $9000 over two transactions on or about November 14 and 20, 2019 after performing internet research on the company.

*"John Scott" is Shane Schmidt*

29.     As set forth below, I have probable cause to believe that "John Scott" is actually SCHMIDT—a fact that was not disclosed to prospective investors in SSTU—and that it was SCHMIDT who took the steps set forth above while posing as "John Scott" as part of a scheme to defraud prospective investors in SSTU for his personal benefit.

30.     In March 2019, "John Scott" submitted a new application on behalf of SSTU for OTC Markets' "Disclosure and New Service." The service would "[d]istribute your company's news, research and financial reports to www.otcmarkets.com and other financial information portals, so that investors can analyze, value, and trade your company's stock." Several items about the application reflect that it was in fact submitted by SCHMIDT:

> a.     The application provided a date of birth for "John Scott" that is SCHMIDT's date of birth;
>
> b.     The personal information form for "John Scott" provides that Scott "splits time between Tucson and Vancouver"—the latter being the city where SCHMIDT resides; and,

      c.   The passport submitted for "John Scott" (from email address

johnscott@sstu.biz) is a picture of a fake passport bearing SCHMIDT's

picture and SCHMIDT's date of birth (but with the name "John Scott").

31.     Records of payments to OTC Markets further reflect SCHMIDT's involvement.

The $4000 invoice for SSTU's OTC Markets' application was paid by a Wyoming corporation

for which SCHMIDT was the sole owner.  And when a $3000 invoice for OTC Markets'

disclosure and news service came due in August 2019, SCHMIDT again paid it, this time from

his personal bank account.

32.     OTC Markets also maintained a log of the IP addresses used to login to its system

in connection with the SSTU account.  That information likewise points to SCHMIDT's control

of the account and impersonation of "John Scott."  (IP addresses are unique numerical labels

assigned to each device connected to a computer network, to include the Internet.)

33.     The log reflects 21 logins to the OTC Markets system between January 2019 and

February 2020 for the SSTU account.  Between January and May 2019, all 11 logins were from

the IP address 172.218.7.74 (the "172 IP Address").  And between August 2019 and May 2020,

all of the remaining 10 logins were from IP address 108.172.4.193 (the "108 IP Address"),

including the login on October 11, 2019 during which SSTU's profile was updated to point

prospective investors to SSTU's new (and false and misleading) website.  Both IP addresses

have significant ties to SCHMIDT.

34.     First, both addresses were used numerous times to login in to SCHMIDT's

personal bank account and to the bank account for his Wyoming corporation.  The 172 IP

Address was used to login to his personal bank account nearly every month between November

2018 and July 2019, and the 108 IP Address was used to login to the same account every month

from July through October 2019.  The same IP addresses were also used to login to the bank account for his Wyoming corporation with similar frequency during the same respective time periods.

35.     Second, both the 172 IP Address and the 108 IP Address were used to login to SCHMIDT's personal yahoo.com email account during similar time periods.  Subscriber records for the yahoo.com account reflect that it is associated with "shane schmidt" from a Vancouver zip code.  Login information reflects that the 172 IP Address logged in to the account in June and July 2019, while the 108 IP Address logged in to the account in July and August 2019 and February 2020.

36.     Third, the 108 IP Address is tied to a woman with whom SCHMIDT appears to have a close relationship.  Subscriber information from a Canadian telecommunications company reflects that the 108 IP Address is associated with a woman in Vancouver (Individual 3).  The day after SCHMIDT's birthday in 2016, a Facebook account for a woman with a nearly identical name to Individual 3's shows SCHMIDT and a woman posing with dessert at a restaurant.  A comment to the post states "Happy birthday Shane!!"

37.     IP Address information for the sstu.biz domain further reflects SCHMIDT's undisclosed control of SSTU.  Subscriber records from Bluehost reflect that the 172 IP Address—used to access SCHMIDT's bank accounts and the OTC Markets system for SSTU— is the same IP address that was used to set up the sstu.biz account for customer "John Scott" in December 2018.  In addition, Bluehost, like OTC Markets, maintains an IP address log of customer access, though only for a limited period of time.  Log data for sstu.biz reflects that the 108 IP Address—used to access SCHMIDT's bank accounts and the OTC Markets system for

SSTU—accessed the johnscott@sstu.biz email account on a near daily basis between mid-February 2020 and early April 2020.

38.     IP Address information for the email account sandysteeleunlimited@gmail.com further reflects SCHMIDT's role in SSTU.  That gmail account was provided to Bluehost and the Minnesota Secretary of State as the email account for "John Scott."   Subscriber information for the gmail account reflects that it was deleted April 7, 2020, four days after the SEC suspended trading in SSTU's stock due to questions about the "accuracy and adequacy of information in the marketplace" about the stock.  IP address information reflects that, moments before the gmail account was deleted, it was logged in to from an IP address that also logged in to SCHMIDT's personal yahoo.com email account just under two hours later.

39.     SCHMIDT's banking records further reflect that SCHMIDT—not "John Scott"—paid the Minnesota Secretary of State at least twice in close proximity to SSTU filings.  In late November 2018, shortly before SSTU was reinstated, SCHMIDT paid $55 to the Minnesota Secretary of State's office from his personal bank account.  And then in June 2019, within two days of an amendment to SSTU's articles of incorporation increasing the number of shares the company was authorized to issue, SCHMIDT's Wyoming corporation paid the Minnesota Secretary of State another $55.

40.     Finally, I have tried to contact "John Scott" without success via the phone and email contact information provided in SSTU's OTC Markets' disclosures.

*Schmidt Receives Payment from SSTU Sale Proceeds*

41.     Approximately one day after Corporate Shareholder 1 was issued its 3 million shares of SSTU stock, it purportedly entered in a share purchase agreement to sell all of the shares to an entity based in Hong Kong ("Trading Entity 1") for $10,000.  Trading Entity 1 was

issued the shares on or about July 30, 2019, and deposited the shares at a broker in Toronto, Canada, in or about August 2019.

42.     During the period October 24, 2019 through December 19, 2019—shortly after "John Scott" established the bogus SSTU website and at or about the same time as the boiler room campaign promoted the stock to Investor 1 and others—Trading Entity 1 sold approximately 2.1 million SSTU shares, for total proceeds of approximately $545,000.

43.     Between November 8 and December 31, 2019, a bank account associated with Trading Entity 1 wired over $380,000 to Corporate Shareholder 1 across four payments.  A memo line associated with each payment stated "SPA SSTU."  I know from training and experience that a share purchase agreement is commonly referred to as a "SPA."

44.     On the same day as the first of these four payments, Corporate Shareholder 1 obtained a bank draft for $20,880 (CAD) issued to a British Columbia corporation for which SCHMIDT is the sole director and owner.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## Conclusion

45.      Based on my knowledge, training and experience, and the facts set forth in this affidavit, I have probable cause to believe and I do believe that SCHMIDT committed the offenses conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5.

Respectfully submitted,

/s/ Keith Brown

Keith Brown, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to telephonically in accordance with Fed. R. Crim. P. 41(d)(3) on this 8th day of June 2020.

HONORABLE M. PAGE KELLEY
United States Magistrate Judge